U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TRANSCOM ENHANCED | § | Case No. 05-31929-HDH-11 |
| SERVICES, LLC, | § | |
| | § | |
| Debtor. | § | |

## MEMORANDUM OPINION

On April 14, 2005, this Court considered Transcom Enhanced Services, LLC's (the "Debtor's") Motion To Assume AT&T Master Agreement MA Reference No. 120783 Pursuant To 11 U.S.C. § 365 ("Motion").[1] At the hearing, the Debtor, AT&T, and Southwestern Bell Telephone, L.P., et al ("SBC Telcos") appeared, offered evidence, and argued. These parties also submitted post-hearing briefs and proposed findings of fact and conclusions of law supporting their positions. This memorandum opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 151, and the standing order of reference in this district. This matter is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(A) & (O).

I. **Background Facts**

This case was commenced by the filing of a voluntary Bankruptcy Petition for relief under Chapter 11 of the Bankruptcy Code on February 18, 2005. The Debtor is a wholesale

---

[1] Debtor's Exhibit 1, admitted during the hearing, is a true, correct and complete copy of the Master Agreement between Debtor and AT&T.

Memorandum Opinion                                                                                          Page 1

provider of transmission services providing its customers an Internet Protocol ("IP") based network to transmit long-distance calls for its customers, most of which are long-distance carriers of voice and data.

In 2002, a company called DataVoN, Inc. invested in technology from Veraz Networks designed to modify the aural signal of telephone calls and thereby make available a wide variety of potential new services to consumers in the area of VoIP. The FCC had long supported such new technologies, and the opportunity to change the form and content of the telephone calls made it possible for DataVoN to take advantage of the FCC's exemption provided for Enhanced Service Providers ("ESP"s), significantly reducing DataVoN's cost of telecommunications service.

On September 20, 2002, DataVoN and its affiliated companies filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, before Judge Steven A. Felsenthal. Southwestern Bell was a claimant in the DataVoN bankruptcy case. On May 19, 2003, the Debtor was formed for purposes of acquiring the operating assets of DataVoN. The Debtor was the winning bidder for the assets of DataVoN and on May 28, 2003, the bankruptcy court approved the sale of substantially all of the assets of DataVoN to the Debtor. Included in the order approving the sale, were findings by Judge Felsenthal that DataVoN provided "enhanced information services".

On July 11, 2003, AT&T and the Debtor entered into the AT&T Master Agreement MA Reference No. 120783 (the "Master Agreement"). In an addendum to the Master Agreement, executed on the same date, the Debtor states that it is an "enhanced information services" provider, providing data communications services over private IP networks (VoIP), such VoIP

services are exempt from the access charges applicable to circuit switched interexchange calls, and such services would be provided over end user local services (such as the SBC Telcos).

AT&T is both a local-exchange carrier and a long-distance carrier of voice and data. The SBC Telcos are local exchange carriers that both originate and terminate long distance voice calls for carriers that do not have their own direct, "last mile" connections to end users. For this service, SBC Telcos charge an access charge. Enhanced service providers ("ESP's") are exempt from paying these access charges, and the SBC Telcos had been in litigation with DataVoN during its bankruptcy, and has recently been in litigation with the Debtor, AT&T and others over whether certain services they provide are entitled to this exemption to access charges.

On April 21, 2004, the FCC released an order in a declaratory proceeding between AT&T and SBC (the "AT&T Order") that found that a certain type of telephone service provided by AT&T using IP technology was not an enhanced service and was therefore not exempt from the payment of access charges. Based on the AT&T Order, before the instant bankruptcy case was filed, AT&T suspended Debtor's services under the Master Agreement on the grounds that the Debtor was in default under the Master Agreement. Importantly, the alleged default of the Debtor is not a payment default, but rather pursuant to Section 3.2 of the Master Agreement, which, according to AT&T, gives AT&T the right to immediately terminate any service that AT&T has reason to believe is being used in violation of laws or regulations.

AT&T asserts that the services that the Debtor provides over its IP network are substantially the same as were being provided by AT&T, and therefore, the Debtor is also not exempt from paying these access charges. At the point that the bankruptcy case was filed, service had been suspended by AT&T pending a determination that the Debtor is an ESP, but

AT&T had not yet assessed the access charges that it asserts are owed by the Debtor.

## II. Issues

The issues before the Court are:

(1) Whether the Debtor has met the requirements of § 365 in order to assume the Master Agreement; and

(2) Whether the Debtor is an enhanced service provider ("ESP"), and is thus exempt from the payment of certain access charges in compliance with the Master Agreement.[2]

---

[2] AT&T has stated in its Objection to the Motion that since it does not object to the Debtor's assumption of the Master Agreement provided the amount of the cure payment can be worked out, the Court need not reach the issue of whether the Debtor is an ESP. However, this argument appears disingenuous to the Court. AT&T argues that the entire argument over cure amounts is a difference of about $28,000.00 that AT&T is willing to forgo for now. However, AT&T later states in its objection (and argued at the hearing):

> To be sure, this is not the total which ultimately Transcom may owe. It is also possible that . . . Transcom will owe additional amounts if it is determined that it should have been paying access charges. But at this point, AT&T has not billed for the access charges, so under the terms of the Addendum, they are not currently due. . . . AT&T is not requiring Transcom to provide adequate assurance of its ability to pay those charges should they be assessed, but will rely on the fact that post-assumption, these charges will be administrative claims. . . . Although Transcom's failure to pay access charges with respect to prepetition traffic was a breach, the Addendum requires, as a matter of contract, that those pre-petition charges be paid when billed. This contractual provision will be binding on Transcom post-assumption, and accordingly, is not the subject of a damage award now."

AT&T Objection p. 3-4. As will be discussed below, in evaluating the Debtor's business judgment in approving its assumption Motion, the Court must determine whether or not its approval of the Motion will result in a potentially large administrative expense to be borne by the estate.

AT&T argues against the Court's jurisdiction to determine this question as part of an assumption motion. However, the Court wonders if AT&T will make the same argument with regard to its post-assumption administrative claims it plans on asserting for past and future access charges that it states it will rely on for payment instead of asking for them to be included as cure

III. **Analysis**

Under § 365(b)(1), a debtor-in-possession that has previously defaulted on an executory contract[3] may not assume that contract unless it: (A) cures, or provides adequate assurance that it will promptly cure, the default; (B) compensates the non-debtor party for any actual pecuniary loss resulting from the default; and (C) provides adequate assurance of future performance under such contract. *See* 11 U.S.C. § 365(b)(1).

In its objection, briefing and arguments made at the hearing, AT&T does not object to the Debtor's assumption of the Master Agreement, provided the Debtor pays the cure amount, as determined by the Court. It does not expect the Debtor to cure any non-monetary defaults, including payment or proof of the ability to pay the access charges that have been incurred, as alleged by the SBC Telcos, as a prerequisite to assumption. *See In re BankVest Capital Corp.*, 360 F.3d 291, 300-301 (1st Cir. 2004), *cert. denied*, __ U.S. __, 124 S.Ct. 2874, 159 L.Ed. 2d 776 (2004) ("Congress meant § 365(b)(2)(D) to excuse debtors from the obligation to cure non-monetary defaults as a condition of assumption.").

Only the Debtor offered evidence of the cure amounts due at the hearing totaling $103,262.55. Therefore, based on this record, the current outstanding balance due from Debtor to AT&T is $103,262.55 (the "Cure Amount"). Thus, upon payment of the Cure Amount Debtor's Motion should be approved by the Court, provided the Debtor can show adequate assurance of future performance.

AT&T argues that this is where the Court's inquiry should cease. Since AT&T has

---

payments under the present Motion.

[3] The parties agree that the Master Agreement is an executory contract.

suspended service under the Master Agreement, whether or not the Debtor is an ESP, and thus exempt from payment of the disputed access charges is irrelevant, because no future charges will be incurred, access or otherwise. This is because no service will be given by AT&T until the proper court makes a determination as to the Debtor's ESP status. However, in its argument, AT&T ignores the fact that part of the Court's necessary determination in approving the Debtor's motion to assume the Master Agreement is to ascertain whether or not the Debtor is exercising proper business judgment. *See In re Lilgeberg Enter., Inc.*, 304 F.3d 410, 438 (5th Cir. 2002); In re *Richmond Leasing Co.*, 762 F.2d 1303, 1309 (5th Cir. 1985).

If by assuming the Master Agreement the Debtor would be liable for the large potential administrative claim, to which AT& T argues that it will be entitled,[4] or if the Debtor cannot show that it can perform under the Master Agreement, which states that the Debtor is an enhanced information services provider exempt from the access charges applicable to circuit switched interexchange calls, and the Debtor would loose money going forward under the Master Agreement should it be determined that the Debtor is not an ESP, then the Court should deny the Motion. On this record, the Debtor has established that it cannot perform under the Master Agreement, and indeed cannot continue its day-to-day operations or successfully reorganize, unless it qualifies as an Enhanced Service Provider.

AT&T and SBC Telcos argue that a forum selection clause in the Master Agreement should be enforced and that any determination as to whether the Debtor is an ESP, and thus exempt from access charges, must be tried in New York. While this argument may have validity in other contexts, the Court concludes that it has jurisdiction to decide this issue as it arises in the

---

[4] See n. 2 above.

context of a motion to assume under § 365. *See In re Mirant Corp.*, 378 F.3d 511, 518 (5th Cir. 2004) (finding that district court may authorize the rejection of an executory contract for the purchase of electricity as part of a bankruptcy reorganization and that the Federal Energy Regulatory Commission did not have exclusive jurisdiction in this context); *see also, Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056 (5th Cir. 1997) (Bankruptcy Court possessed discretion to refuse to enforce an otherwise applicable arbitration provision where enforcement would conflict with the purpose or provisions of the Bankruptcy Code).

*In re Orion*, which is heavily relied upon by AT&T, is inapplicable in this proceeding. *See In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993). On its face, *Orion* is distinguishable from this case in that in *Orion*, the debtor sought damages in an adversary proceeding at the same time it was seeking to assume the contract in question under Section 365. The bankruptcy court decided the Debtor's request for damages as a part of the assumption proceedings awarding the Debtor substantial damages. Here, the Debtor is not seeking a recovery from AT&T under the contract which would augment the estate. Rather the Debtor is only seeking to assume the contract within the parameters of Section 365. Similar issues to the one before this Court have been advanced by another bankruptcy court in this district.

The court in *In re Lorax Corp.*, 307 B.R. 560 (Bankr. N.D. Tex. 2004), succinctly pointed out that a broad reading of the Orion opinion runs counter to the statutory scheme designed by Congress. *Lorax*, 307 B.R. at 566 n. 13. The *Lorax* court noted that *Orion* should not be read to limit a bankruptcy court's authority to decide a disputed contract issue as part of hearing an assumption motion. *Id.* To hold otherwise would severely limit a bankruptcy court's inherent

equitable power to oversee the debtor's attempt at reorganization and would diffuse the bankruptcy court's power among a number of courts. The *Lorax* court found such a result to be at odds with the Supreme Court's command that reorganization proceed efficiently and expeditiously. *Id.* at 567 (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 376 (1988)). This Court agrees. The determination of the Debtors status as an ESP is an important part of the assumption motion.

Since the Second Circuit's 1993 *Orion* opinion, the Second Circuit has further distinguished non-core and core jurisdiction proceedings involving contract disputes. In particular, if a contract dispute would have a "much more direct impact on the core administrative functions of the bankruptcy court" versus a dispute that would merely involve "augmentation of the estate," it is a core proceeding. *In re United States Lines, Inc.*, 197 F.3d 631, 638 (2d Cir. 1999) (allowing the bankruptcy court to resolve disputes over major insurance policies, and recognizing that the debtor's indemnity contracts could be the most important asset of the estate). Accordingly, the Second Circuit would reach the same conclusion of core jurisdiction here since the dispute addressed by the Motion "directly affect[s]" the bankruptcy court's "core administrative function." *United States Lines.* at 639 (citations omitted).

Determination, for purposes of the motion to assume, of whether the Debtor qualifies as an ESP and is exempt from paying access charges (the "ESP Issue") requires the Court to examine and take into account certain definitions under the Telecommunications Act of 1996 (the "Telecom Act"), and certain regulations and rulings of the Federal Communications Commission ("FCC"). None of the parties have demonstrated, however, that this is a matter of first impression or that any conflict exists between the Bankruptcy Code and non-Code cases.

Thus, the Court may decide the ESP issues for purposes of the motion to assume.

Several witnesses testified on the issues before the Court. Mr. Birdwell and the other representatives of the Debtor were credible in their testimony about the Debtor's business operations and services. The record establishes by a preponderance of the evidence that the service provided by Debtor is distinguishable from AT&T's specific service in a number of material ways, including, but not limited to, the following:

(a) Debtor is not an interexchange (long-distance) carrier.

(b) Debtor does not hold itself out as a long-distance carrier.

(c) Debtor has no retail long-distance customers.

(d) The efficiencies of Debtor's network result in reduced rates for its customers.

(e) Debtor's system provides its customers with enhanced capabilities.

(f) Debtor's system changes the content of every call that passes through it.

On its face, the AT&T Order is limited to AT&T and its specific services. This Court holds, therefore, that the AT&T Order does not control the determination of the ESP Issue in this case.

The term "enhanced service" is defined at 47 CFR § 67.702(a) as follows:

For the purpose of this subpart, the term enhanced service shall refer to services, offered over common carrier transmission facilities used in interstate communications, which employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information; provide the subscriber additional, different, or restructured information; or involve subscriber interaction with stored information. Enhanced services are not regulated under title II of the Act.

The term "information service" is defined at 47 USC § 153(20) as follows:

> The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

Dr. Bernard Ku, who testified for SBC was a knowledgeable and impressive witness. However, during cross examination, he agreed that he was not familiar with the legal definition for enhanced service.

The definitions of "enhanced service" and "information service" differ slightly, to the point that all enhanced services are information services, but not all information services are also enhanced services. See First Report And Order, *In the Matter of Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934*, as amended, 11 FCC Rcd 21905 (1996) at ¶ 103.

The Telecom Act defines the terms "telecommunications" and "telecommunications service" in 47 USC § 153(43) and (46), respectively, as follows:

> The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, *without change in the form or content* of the information as sent and received. (emphasis added).

> The term "telecommunications service" means the offering of *telecommunications* for a fee directly to the public, or to such class of users as to be effectively available directly to the public, regardless of the facilities used. (emphasis added).

These definitions make clear that a service that routinely changes either the form or the content of the transmission would fall outside of the definition of "telecommunications" and therefore would not constitute a "telecommunications service."

Whether a service pays access charges or end user charges is determined by 47 C.F.R.

§ 69.5, which states in relevant part as follows:

> (a) End user charges shall be computed and assessed upon end users . . . as defined in this subpart, and as provided in subpart B of this part. (b) Carrier's carrier charges [i.e., access charges] shall be computed and assessed upon all interexchange carriers that use local exchange switching facilities *for the provision of interstate or foreign telecommunications services.* (emphasis added).

As such, only telecommunications services pay access charges. The clear reading of the above provisions leads to the conclusion that a service that routinely changes either the form or the content of the telephone call is an enhanced service and an information service, not a telecommunications service, and therefore is required to pay end user charges, not access charges.

Based on the evidence and testimony presented at the hearing, the Court finds, for purposes of the § 365 motion before it, that the Debtor's system fits squarely within the definitions of "enhanced service" and "information service," as defined above. Moreover, the Court finds that Debtor's system falls outside of the definition of "telecommunications service" because Debtor's system routinely makes non-trivial changes to user-supplied information (content) during the entirety of every communication. Such changes fall outside the scope of the operations of traditional telecommunications networks, and are not necessary for the ordinary management, control or operation of a telecommunications system or the management of a telecommunications service. As such, Debtor's service is not a "telecommunications service" subject to access charges, but rather is an information service and an enhanced service that must pay end user charges. Judge Felsenthal made a similar finding in his order approving the sale of the assets of DataVoN to the Debtor, that DataVoN provided "enhanced information services". *See* Order Granting Motion to Sell, 02-38600-SAF-11, no. 465, entered May 29, 2003. The

Debtor now uses DataVoN's assets in its business.

Because the Court has determined that the Debtor's service is an "enhanced service" not subject to the payment of access charges, the Debtor has met its burden of demonstrating adequate assurance of future performance under the Master Agreement. The Debtor has demonstrated that it is within Debtor's reasonable business judgment to assume the Master Agreement.

Regardless of the ability of the Debtor to assume this agreement, the Court cannot go further in its ruling, as the Debtor has requested to order AT&T to resume providing service to the Debtor under the Master Agreement. The Court has reached the conclusions stated herein in the context of the § 365 motion before it and on the record made at the hearing. An injunction against AT&T would require an adversary proceeding, a lawsuit. Both the Debtor and AT&T are still bound by the exclusive jurisdiction provision in § 13.6 of the Master Agreement, as found by the United States District Court for the Northern District of Texas, Hon. Terry R. Means. As Judge Means ruled, any suit brought to enforce the provisions of the Master Agreement must be brought in New York.

## IV. Conclusion

In conclusion, the Court finds that the provisions of 11 U.S.C. § 365 have been met in this case. Because the Court finds that the Debtor's service is an enhanced service, not subject to payment of access charges, it is therefore within Debtor's reasonable business judgment to assume the Master Agreement with AT&T.

Only the Debtor offered evidence of the cure amounts at the hearing. Based on the record at the hearing, the current outstanding balance due from Debtor to AT&T is $103,262.55. To

assume the Master Agreement, the Debtor must pay this Cure Amount to AT&T within ten (10) days of the entry of the Court's order on this opinion.

A separate order will be entered consistent with this memorandum opinion.

SIGNED: 4/28/05

**Harlin D. Hale**
**United States Bankruptcy Judge**